**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

_____

CELIA A. B.,

                                        Plaintiff,

             v.

                                                      No. 5:21-CV-112
COMMISSIONER OF SOCIAL SECURITY,                      (CFH)

                                        Defendant.

_____

**APPEARANCES:**                          **OF COUNSEL:**

Law Offices of Kenneth Hiller, PLLC       JUSTIN M. GOLDSTEIN, ESQ.
6000 North Bailey Avenue – Suite 1A       KENNETH R. HILLER, ESQ.
Amherst, New York 14226
Attorneys for plaintiff

Social Security Administration            AMELIA STEWART, ESQ.
J.F.K. Federal Building,
15 New Sudbury Street
Boston, Massachusetts 02203
Attorney for defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

## MEMORANDUM-DECISION AND ORDER[1]

       Celia A. B.[2] ("plaintiff" or "the claimant") brings this action pursuant to 42 U.S.C.

§ 405(g) seeking review of a decision by the Commissioner of Social Security ("the

Commissioner") denying her application for disability insurance benefits.  See Dkt. No. 1

---

[1] Parties consented to direct review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c),
Fed. R. Civ. P. 73, N.D.N.Y. Local Rule 72.2(b), and General Order 18.  See Dkt. No. 5.
[2] In accordance with guidance from the Committee on Court Administration and Case Management of the
Judicial Conference of the United States, which was adopted by the Northern District of New York in 2018
to better protect personal and medical information of non-governmental parties, this Memorandum-
Decision and Order will identify plaintiff's last name by initial only.

("Compl.").  Plaintiff moves for judgment on the pleadings and for reversal and remand of the Commissioner's decision for further proceedings.  <u>See</u> Dkt. No. 14.  The Commissioner cross moves for judgment on the pleadings.  <u>See</u> Dkt. No. 17.  For the following reasons, plaintiff's motion is granted, the Commissioner's motion is denied, and the Commissioner's decision is reversed and remanded for further proceedings.

## I. Background

On October 11, 2017, plaintiff filed a Title II application for disability insurance benefits.  <u>See</u> T. at 10, 123.[3],[4]  Plaintiff alleged a disability onset date of April 26, 2017.  <u>See</u> <u>id.</u> at 10, 123.  The Social Security Administration ("SSA") denied plaintiff's claims on February 1, 2018.  <u>See</u> <u>id.</u> at 124.  Plaintiff requested a hearing, <u>see</u> <u>id.</u> at 129-30, and two hearings were held on September 4, 2019, and April 3, 2020, before Administrative Law Judge ("ALJ") Robyn L. Hoffman.  <u>See</u> <u>id.</u> at 36-107.  On April 20, 2020, the ALJ issued an unfavorable decision.  <u>See</u> <u>id.</u> at 7-29.  On December 1, 2020, the Appeals Council denied plaintiff's request for review.  <u>See</u> <u>id.</u> at 1-5.  Plaintiff timely commenced this action on January 31, 2021.  <u>See</u> Compl.

## II. Legal Standards

---

[3] "T." followed by a number refers to the pages of the administrative transcript filed by the Commissioner.  <u>See</u> Dkt. No. 10.  Citations to the administrative transcript refer to the pagination in the bottom, right-hand corner of the page, not the pagination generated by CM/ECF.
[4] The Commissioner states that plaintiff's application for benefits does not appear in the administrative transcript, but that there is no dispute as to plaintiff's application date or alleged onset date.  <u>See</u> Dkt. No. 17 at 2, n.1; <u>see</u> <u>also</u> Dkt. No. 14 at 2.

**A. Standard of Review**

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled. See 42 U.S.C. §§ 405(g), 1388(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990). Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied or it was not supported by substantial evidence. See Johnson v. Bowen, 817 F.2d 983, 985-86 (2d Cir. 1987); Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982). Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (per curiam) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)). The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would have to conclude otherwise." Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (per curiam) (internal quotations marks, citation, and emphasis omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion is arguably supported by substantial evidence. See Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson, 817 F.2d at 986). However, if the correct legal standards were applied and the ALJ's finding is supported by substantial evidence, such finding must be sustained "even where substantial evidence may support the plaintiff's position and despite that the court's

3

independent analysis of the evidence may differ from the [Commissioner's]." <u>Rosado v. Sullivan</u>, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation omitted).

### B. Determination of Disability

"Every individual who is under a disability shall be entitled to a disability . . . benefit . . . ." 42 U.S.C. § 423(a)(1)(E).  Disability is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months[.]"  <u>Id.</u> § 423(d)(1)(A).  A medically-determinable impairment is an affliction that is so severe that it renders an individual unable to continue with his or her previous work or any other employment that may be available to him or her based upon age, education, and work experience.  <u>See id.</u> § 423(d)(2)(A).  Such an impairment must be supported by "medically acceptable clinical and laboratory diagnostic techniques."  <u>Id.</u> § 423(d)(3).  Additionally, the severity of the impairment is "based on objective medical facts, diagnoses[,] or medical opinions inferable from [the] facts, subjective complaints of pain or disability, and educational background, age, and work experience."  <u>Ventura v. Barnhart</u>, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing <u>Mongeur v. Heckler</u>, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which

significantly limits his [or her] physical or mental ability to do basic work activities.

If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity.

Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.

Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). "If at any step a finding of disability or non-disability can be made, the SSA will not review the claim further." Barnhart v. Thomas, 540 U.S. 20, 24 (2003). The plaintiff bears the initial burden of proof to establish each of the first four steps. See DeChirico v. Callahan, 134 F.3d 1177, 1180 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step, the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere. Id. (citing Berry, 675 F.2d at 467).

### III. The ALJ's Decision

Applying the five-step disability sequential evaluation, the ALJ first determined that plaintiff had not engaged in substantial gainful activity since April 26, 2017, the

alleged onset date.  See T. at 13.  At step two, the ALJ found that plaintiff had "the

following severe impairments: post-concussion syndrome, lumbar spine impairment,

cervical spine impairment, and vision impairment[.]"  Id.  At step three, the ALJ

determined that plaintiff did not have an impairment or combination of impairments that

met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part

404, Subpart P, Appendix 1.  See id. at 16.  Before reaching step four, the ALJ

concluded that plaintiff retained the residual functional capacity ("RFC") to perform light

work as defined in 20 C.F.R. § 404.1567(b)

> insofar as she can occasionally lift and carry twenty pounds; frequently lift
> and carry ten pounds; sit for up to six hours; stand or walk for
> approximately six hours, all in an eight-hour workday with normal breaks.
> She can frequently climb ramps or stairs; but can never climb ladders,
> ropes, or scaffolds.  She can frequently balance, kneel, crouch, and crawl,
> but should only occasionally stoop.  She can occasionally reach overhead
> with her bilateral arms, but is unlimited in her ability to reach in all other
> directions.  She should avoid concentrated exposure to fumes, odors,
> dusts, gases, and poor ventilation.  She is limited to goal oriented work,
> not production pace work.

Id.  At step four, the ALJ determined that plaintiff was "capable of performing past

relevant work as an order clerk, or as a customer service representative."  Id. at 21.

The ALJ proceeded to step five and concluded that "[i]n addition to past relevant work,

there are other jobs that exist in significant numbers in the national economy that the

claimant also can perform, considering the claimant's age, education, work experience,

and [RFC]."  Id.  Thus, the ALJ determined that plaintiff had "not been under a disability,

as defined in the Social Security Act, from April 26, 2017, through the date of th[e]

decision[.]"  Id. at 22.

## IV. Discussion[5]

Plaintiff argues that the ALJ erred in discussing a medical opinion from plaintiff's treating provider, Brittany Gandy, M.D., because the ALJ did not appropriately consider the opinion's "consistency" and "supportability."  Dkt. No. 14 at 17.  Plaintiff also contends that the ALJ erred in rejecting, without explanation, a portion of an opinion from plaintiff's treating mental health provider, Deborah Spinks, Ph.D.  See id. at 21-23.

The Commissioner argues that the ALJ "complied with the applicable regulations" as she addressed the "consistency" and "supportability" of Dr. Gandy's opinion.  Dkt. No. 17 at 4.  The Commissioner also asserts that the ALJ did not need to discuss every limitation from Dr. Spinks' medical opinion and that the ALJ otherwise discussed the relevant limitation throughout her decision.  See id. at 9.

### A.  Dr. Gandy's Opinion

### 1.  Medical Opinion and ALJ Decision

Dr. Gandy was one of plaintiff's treating providers at St. Joseph's Hospital.  See T. at 909-17.  In Dr. Gandy's 2019 medical source statement she noted that plaintiff had been seeing family medicine since April 2017 and had approximately seven to eight appointments a year, she had been seeing the Upstate Concussion Clinic since July 2017, and it was unknown when plaintiff began seeing and how often she saw "spine and wellness" and neurology.  Id. at 849.  Dr. Gandy listed plaintiff's diagnoses as cervical radiculopathy, chronic neck and back pain, bilateral arm weakness, and bilateral headaches.  See id.  She indicated that plaintiff's prognosis was "stable with mild improvement from interventions."  Id.  Dr. Gandy noted that plaintiff was

---

[5] The Court's citations to the parties' briefs refer to the pagination generated by CM/ECF in the pages' headers.

"[i]ncapable of even 'low stress' jobs[.]"  Id.  She also determined that plaintiff could walk for one block, sit for thirty minutes at a time and for a total of two hours in an eight-hour day, stand for thirty minutes at a time, and stand and walk for a total of less than two hours in an eight-hour day.  See id.  Dr. Gandy indicated that plaintiff would need a job that allowed for shifting between sitting, standing, and walking; and she would need to take unscheduled breaks.  See id. at 849-50.  Dr. Gandy wrote that plaintiff would need to take breaks every thirty minutes for approximately ten to fifteen minutes.  See id. at 850.  She also noted that plaintiff could never reach, twist, stoop, and climb ladders; rarely lift or carry less than ten pounds, crouch, look down, handle, and finger; and occasionally turn her head, look up, and climb stairs.  See id. at 850-51.  Dr. Gandy noted that plaintiff would miss more than four days of work per month and plaintiff's pain or other symptoms would "constantly" "interfere with attention and concentration to perform even simple work tasks[.]"  Id. at 851 (emphasis omitted).  Finally, Dr. Gandy wrote that plaintiff's "[e]ye strain from computers leads to headaches."  Id.

The ALJ reiterated Dr. Gandy's opinion and concluded that "[t]his opinion is not persuasive; the assessment is not based on nor consistent with the medical evidence of record, including Dr. Gandy's own treatment notes[.]"  T. at 21 (citation omitted).[6]

### 2.  Analysis

"The regulations explain that when 'evaluat[ing] the persuasiveness of medical opinions and prior administrative medical findings,' the "'most important factors . . . are supportability . . . and consistency.'"  Loucks v. Kijakazi, No. 21-1749, 2022 WL 2189293, at *1 (2d Cir. June 17, 2022) (summary order) (footnote omitted) (quoting 20

---

[6] The Commissioner acknowledges that the ALJ incorrectly cited "Dr Gandy's own treatment notes[.]" T. at 21; see Dkt. No. 17 at 6, n.3.

C.F.R. § 404.1520c(a)).  "Supportability" means "[t]he more relevant the objective

medical evidence and supporting explanations presented by a medical source are to

support his or her medical opinion(s) or prior administrative medical finding(s), the more

persuasive the medical opinions or prior administrative medical finding(s) will be."  20

C.F.R. § 404.1520c(c)(1).  "Consistency" means "[t]he more consistent a medical

opinion(s) or prior administrative medical finding(s) is with the evidence from other

medical sources and nonmedical sources in the claim, the more persuasive the medical

opinion(s) or prior administrative medical finding(s) will be."  Id. § 404.1520c(c)(2).  The

regulations "require the agency to 'explain how [it] considered the supportability and

consistency factors for a medical source's medical opinions or prior administrative

medical findings in [its] determination or decision.'"  Loucks, 2022 WL 2189293, at *1

(quoting 20 C.F.R. § 404.1520c(b)(2)) (alterations in original).

It is "procedural error" for an ALJ to fail "to explain how [he or she] considered the

supportability and consistency of medical opinions in the record."  Loucks, 2022 WL

2189293, at *2 (finding error because the ALJ's discussion of the supportability and

consistency factors consisted of a statement that an opinion was "inconsistent with the

evidence of record during the relevant period."); see also Cassandra A. v. Kijakazi, No.

3:21-CV-007 (ATB), 2022 WL 1597680, at *9 (N.D.N.Y. May 19, 2022) ("The ALJ

merely concluded that [an] opinion was 'supported by the medical evidence of record as

a whole.' . . .  The ALJ's failure to explain his assessment of the opinion was legal

error.") (citing Jaleesa H. v. Comm'r of Soc. Sec., No. 1:20-CV-01180, 580 F. Supp. 3d

1, 9 (W.D.N.Y. Jan. 18, 2022) ("[T]he ALJ did not *explain* anything - instead, he made a

conclusory statement that [an] opinion was 'generally consistent and supportive,'

9

without any explanation of how he assessed the opinion in connection with the consistency and supportability factors which, as explained above, is required by the new regulations"); Melissa S. v. Comm'r Soc. Sec., No. 5:21-CV-420 (DJS), 2022 WL 1091608, at *4 (N.D.N.Y. Apr. 12, 2022) ("[T]he ALJ does nothing more than state that the opinion is inconsistent with the record but offers no explanation as to how that is true.")).  "[H]owever, an ALJ's procedural error in failing to explain how he [or she] 'considered the supportability and consistency of medical opinions in the record' does not necessarily preclude affirmance of the Commissioner's decision." John L. M. v. Kijakazi, No. 5:21-CV-368 (BKS/TWD), 2022 WL 3500187, at *2 (N.D.N.Y. Aug. 18, 2022) (quoting Loucks, 2022 WL 2189293, at *2).  Rather, a court "may affirm" despite procedural error "where the ALJ's consideration of the relevant factors can be gleaned from the ALJ's decision as a whole."  Id. (citations omitted).

Here, the ALJ's one sentence review of Dr. Gandy's opinion, that the opinion was "not based on nor consistent with the medical evidence of record, including Dr. Gandy's own treatment notes[,]" is an insufficient analysis of the supportability and consistency factors and constitutes legal error.  T. at 21; see Cassandra A., 2022 WL 1597680, at *9.  Therefore, the relevant inquiry is whether "a searching review" of ALJ's decision assures the Court "that the substance of the [regulation] was not traversed." Loucks, 2022 WL 2189293, at *2 (quoting Estrella v. Berryhill, 925 F.3d 90, 96 (2d Cir. 2019)) (quotation marks omitted) (alteration in original).

As to supportability, the Commissioner asserts that "the ALJ reasonably determined that Dr. Gandy's extreme opinions were not supported by her own treatment notes."  Dkt. No. 17 at 6.  The Commissioner identifies three treatment notes from Dr.

Gandy wherein she "observed a normal range of motion in [plaintiff's] neck and musculature, a normal mood, and normal affect[]"; plaintiff had an antalgic gait but did not use an assistive device; plaintiff had "no point tenderness over her spine, no pain to palpitation over paraspinal muscles, no erythema or skin changes, and a reduced range of motion of her back due to pain[]"; and she had "a negative straight leg test and no tenderness over her back." Id. at 6-7 (citing T. at 904, 909, 920). The Commissioner states that "[t]he ALJ reasonably determined that this evidence did not support Dr. Gandy's extremely limiting opinion." Id. at 7.

Throughout the ALJ's decision, she cited to one of the three records that the Commissioner identifies. See T. at 16. At step-three, in conducting her Listings analysis, the ALJ stated that "[o]bjective medical evidence shows degenerative disc disease of the cervical and lumbar spine: however, there is no evidence of nerve root compression with sensory and reflex loss along with positive straight-leg raising tests[.]" Id. (citing, inter alia, T. at 904). At step two, the ALJ cited other treatment notes from Dr. Gandy to support the contentions that plaintiff "is obese, presenting with a body mass index between 42.64 and 46.21 during the relevant period," plaintiff "has benign hypertension, which is controlled with medication," her diabetes "is currently controlled with diet and exercise," she was prescribed medication for her headaches, and "over the counter medications help[.]" Id. at 13-14 (citing, inter alia, T. at 892, 897, 903). The ALJ did not discuss a single record from Dr. Gandy when making her RFC determination. See id. at 16-21.

In arguing that the ALJ did not appropriately consider the supportability of Dr. Gandy's opinion, plaintiff identifies records from Dr. Gandy wherein "chronic low back

pain and headaches were noted[]"; an "examination revealed reduced range of motion in all directions in the back due to pain, and there was an antalgic gait[]"; "[o]ther primary care follow-ups noted her headaches and pain[]"; and "she reported her recent radiofrequency ablation only 'mildly' helped pain." Dkt. No. 14 at 18 (citing T. at 371, 380, 390, 397, 902-903, 908-909, 923, 961). Plaintiff also emphasized that in Dr. Gandy's opinion, Dr. Gandy wrote that she had been treating plaintiff since April 2017 and that plaintiff's eye strain would lead to headaches. See id. (citing T. at 849, 851); see also 20 C.F.R. § 404.1520c(c)(1) (explaining that the supportability factor considers the "supporting explanations" provided by a medical source).

As an initial matter, plaintiff's reference to records from "[o]ther primary care follow-ups" are not helpful to a supportability analysis as they are not "objective medical evidence" from Dr. Gandy. Dkt. No. 14 at 18; 20 C.F.R. § 404.1520c(c)(1). Next, although it does not appear that Dr. Gandy had an extensive treatment history with plaintiff, the ALJ did not, anywhere in her decision, discuss (1) Dr. Gandy's treatment notes indicating that plaintiff had pain, range of motion limitations, and an antalgic gait; and (2) whether those records supported Dr. Gandy's opinion. See T. at 13-21. As such, the Court cannot glean the ALJ's rationale in concluding that Dr. Gandy's records did not support her opinion. See id. at 21; see also Stephanie F. v. Kijakazi, No. 8:20-CV-1528 (BKS), 2022 WL 3355964, at *10 (N.D.N.Y. Aug. 15, 2022) ("Having conducted a searching review of the record, the Court [] finds that the substance of the regulations was traversed and the ALJ's procedural error was not harmless. [T]here is nothing in the ALJ's decision from which the Court can glean his consideration of the supportability of [the] opinion. . . . [The] medical source statement contained written

explanations [and] . . . [t]he statement was also largely based on, and expressly incorporated, the functional capacity evaluation that [the provider] performed of [the p]laintiff.").

As to the consistency of Dr. Gandy's opinion with the rest of the record, the ALJ reviewed the objective evidence in the record by first noting that plaintiff was injured in a car accident on April 16, 2017.  See T. at 17 (citing T. at 853).  The ALJ stated that when plaintiff was evaluated on April 20, 2017, she "exhibited left shoulder tenderness, and mild swelling in the upper back shoulder, mild pain with shoulder flexion, but normal strength; she also had diffuse muscle stiffness and tenderness on palpation in the back, front and upper arm, but passive range of motion was within normal limits[.]"  Id. at 17-18 (citing T. at 359).  The ALJ reiterated findings from a May 24, 2017, cervical MRI which "showed mild central disc bulging at C5-6 without any significant stenosis[]"; a "thoracic MRI from the same day showed mild disc bulges T5-6, T6-7 and T7-8 with no significant stenosis[]"; "and [a] lumbar MRI showed edematous changes in the right L5-S1 facet joint and mild disc bulges at L2-3 and L4-5 without stenosis[.]"  Id. at 18 (citing T. at 607).  The ALJ stated that "the claimant's specialist noted that the quality of these images, from an open scanner, made it extremely difficult to visualize the nerve roots[.]"  Id.  The ALJ also discussed MRIs from October 2017, which "revealed some mild disc bulging and mild to moderate bilateral foraminal stenosis at C5-6 and C6-7; [and] very minimal disc degeneration and mild facet arthropathy, mainly at L4-5 with no stenosis or herniation[.]"  Id. (citing T. at 607).

The ALJ stated that during a November 2017 examination, plaintiff "showed a modestly antalgic gait, minimally limited cervical and lumbar range of motion, mild

tenderness over left and right cervical paraspinal areas, left and right lumbar paraspinal areas, cervical spine over right trapezius and over the lumbosacral junction and muscle spasm is present at the cervical spine[.]"  T. at 18.  The examination also revealed that plaintiff's "motor [strength] was 5/5 in the upper and lower extremities, and normal sensory, with the exception of the right lateral thigh[.]  Facet blocks were recommended[.]"  Id. (citing T. at 607).  The ALJ stated that "[t]he claimant's chiropractor noted, on February 10, 2018, that the claimant had improved 70% since the start of care[.]"  Id. (citing T. at 508).

The ALJ also discussed the records relevant to plaintiff's concussion and vision problems.  See T. at 18.  Specifically, the ALJ noted that in September 2017, plaintiff had "convergence insufficiency and oculomotor deficiency status post-concussion"; in October 2017, she "reported headaches, vision issues, attention/memory issues, some increase in right sided tinnitus, as well as persisting anxiety, primarily as a passenger in a car, and that her balance was improving"; in August 2018, she was "cleared her for part-time work, from a concussion perspective"; and "[t]he provider's clinical notes show that the claimant's condition has continued to improve since that date[.]"  Id. (citing T. at 406, 456, 639, 649).

The ALJ recounted the December 2017 physical consultative examination findings which showed that plaintiff could walk on her heels and toes with difficultly; her squat was forty percent; she did not use an assistive device; she did not need help during the examination; she had full ranges of motion in her elbows, forearms, wrists, and ankles; and had reduced ranges of motion in her spine and shoulders.  See T. at 18

(citing T. at 436-38).  The ALJ also relied on plaintiff's treatment history, particularly her

"resist[ance to] treatment recommendations[.]"  Id.  The ALJ stated that plaintiff

> refused to take muscle relaxants, did not take prescribed headache
> medication, declined headache medication altogether, stopped taking a
> prescribed medication, declined physical therapy in July 2017, she failed
> to follow through with her therapist's recommendation of yoga or walking,
> and refused further injection after the initial SI joint injection; when she did
> try physical therapy, she reported improvement, and injections afforded
> the claimant significant relief when she recommenced this treatment in
> 2019[.]

Id. at 18-19 (citing T. at 365, 380, 448, 450-51, 597, 603).  The ALJ also noted that "[i]n

July 2019, the claimant reported that her new insurance did not cover her vision

therapy, and her concussion care provider suggested other providers; there is no record

of further vision therapy[.]  In November 2019, [she] told her neurologist that she was

unable to work because of vision issues[.]"  Id. at 19 (citing T. at 1094-95).  The ALJ

reiterated plaintiff's activities of daily living and concluded that her activities did not

support her allegations.  See id.  Finally, the ALJ reviewed the other medical opinions in

the record including a 2017 evaluation from "shortly after [plaintiff] sustain [her] injuries";

"several conclusory assessments" from another treating provider that plaintiff "was

'totally incapacitated'"; the consultative examiner's and state agency consultant's

opinions; and a medical source statement from a treating provider who did not provide

specific physical limitations but recounted normal results from a 2017 examination.  Id.

at 19-20 (citing T. at 116-18, 428-34, 438, 527-29, 866).

The Commissioner asserts that this recitation of the evidence sufficiently

considers the consistency of Dr. Gandy's opinion with the record.  See Dkt. No. 17 at 4-

6.  Plaintiff disagrees and states that Dr. Gandy's "opinion was consistent with the rest

of the evidence."  Dkt. No. 14 at 19.  Plaintiff identifies "abnormal" diagnostic imaging

which revealed "cervical lordosis, possible muscle spasm, and a central disc herniation at C5-6 with contour of the spinal cord[]"; "herniations at T11-12, L2-3, and L4-5[]"; "edematous changes right of the L5-S1 facet articulation[]"; and "central disc herniations at T5-6, T6-7, T7-8, and T10-11." Id. (citing T. at 425-27). Plaintiff notes that records from 2017 reflect her complaints concerning pain and headaches; "severe lumbar and right trochanteric bursa tenderness; moderate cervical tenderness; she was unable to perform range of motion tests[]"; "pain with motion, tenderness, and Patrick's test and Facet Maneuver remained positive[]"; "reduced cervical and lumbar range of motion[]"; subluxated vertebrae and muscle tonicity in several areas[]"; "trigger points in the right trapezius and cervical paraspinals[]"; coordination limited by pain, antalgic gait, reduced range of motion, and tenderness[]"; and "[c]ervical muscle spasms[.]" Id. (citing T. at 350, 355, 422, 476, 449, 537, 607); see also T. at 371, 380, 390, 397, 923, 961. Plaintiff states that 2018 records indicate "tenderness to palpation in the paraspinals and trapezius, and increased pain with range of motion[]"; and she "started Chlorzoxazone for muscle spasms." Dkt. No. 14 at 19 (citing T. 584, 586, 591). "[B]y February 2019, she continued to report [] radiating pain[]"; an "[e]xamination still reve[al]ed bilateral tenderness to palpation of the paraspinals and trapezius, and increased pain with range of motion[]"; "[t]here was some improvement with a nerve block injection in arm pain[]"; an "[e]xamination still reve[al]ed tenderness to palpation of the paraspinals remained bilaterally, and range of motion increased pain[]"; "she reported continued back and neck pain[]"; and "[a] radiofrequency ablation was not helpful, and [she was] prescribed meloxicam." Id. at 19-20 (citing T. at 572, 574, 578, 580, 838, 1079, 1086).

16

Although it is true that the ALJ does not need to cite every piece of evidence that he or she relies on, an ALJ cannot ignore evidence that is supportive of a plaintiff's claims.  See Cichocki v. Astrue, 729 F.3d 172, 178 n.3 (2d Cir. 2013) (quoting Mongeur v. Heckler, 722 F.2d 1033, 1040 (2d Cir. 1983) ("An ALJ need not recite every piece of evidence that contributed to the decision, so long as the record 'permits us to glean the rationale of an ALJ's decision.'"); Ryan v. Astrue, 650 F. Supp. 2d 207, 216 (N.D.N.Y. 2009) ("[T]he ALJ cannot ignore evidence supporting [the p]laintiff's claim while at the same time accepting evidence that supports his [or her] decision.").  As the ALJ discussed, and as the Commissioner states, there is evidence supporting the ALJ's conclusions including "improvement with treatment in the months following [plaintiff's] accident[,]" the consultative examiner's opinion, the state agency consultant's opinion, and plaintiff's activities of daily living.  T. at 18-20.  However, the ALJ did not reconcile this evidence with other evidence in the record that shows that plaintiff consistently complained of pain in her back and neck as well as ongoing headaches; that not only in the months following her accident, but in 2018 and 2019, she had tenderness, muscle spasms, antalgic gait, and increased pain with movement; she had short term relief from "the facet block[,]" but after two weeks, was in pain and reported that the radiofrequency ablation did not help; and she was started on a new NSAID medication.  Id. at 350, 355, 390, 397, 422, 537, 578, 580, 584, 586, 591, 1082, 1086.

Although there is evidence supporting the ALJ's conclusions, the ALJ's lack of discussion of conflicting evidence does not permit meaningful judicial review.  See Stephanie F., 2022 WL 3355964, at *10 (citations omitted) ("It is true that these treatment notes show that [the p]laintiff occasionally showed normal gait, normal

sensory and motor exams, negative straight leg tests, and normal muscle strength. However, the ALJ did not discuss or reconcile the record evidence indicating that [the p]laintiff consistently complained of persistent hip and thigh pain after her surgery, had a limp or otherwise abnormal gait, tenderness over her right hip, and had multiple emergency room visits complaining of hip pain[.]  Given the ALJ's sparse discussion of and citations to the record, and his failure to grapple with contradictory evidence in the record, the Court cannot conclude that the substance of the regulation requiring him to evaluate the consistency of [the] opinion was not traversed.") (citing Lisa T. v. Kijakazi, No. 3:20-CV-1764 (SVN), 2022 WL 2207613, at *8 (D. Conn. June 21, 2022) ("It may be the case that there are articulable reasons why the ALJ did not find [an] opinion persuasive.  But without a more fulsome explanation of why the ALJ rejected portions of [the] opinion, the Court is not in a position to review whether the ALJ's conclusions are supported by substantial evidence.")); see also Estrada v. Comm'r of Soc. Sec., No. 21-CV-00153 (SDA), 2022 WL 3337753, at *14 (S.D.N.Y. Aug. 13, 2022) (citations and footnote omitted) (remanding the ALJ's decision because "the ALJ does not explain why those records, which appear to be from the spring of 2019 or later, rendered [an] opinion inconsistent for the entire period at issue, or how they were inconsistent with [the] opinion regarding [the plaintiff's] off-task percentage.  Moreover, as [the p]laintiff points out, the ALJ also does not address later contrary evidence that her pain continued even after she received some relief from trigger point injections and the first cervical epidural.  Notably, in July 2019, [the plaintiff] testified that the epidural injections she received for back pain did not provide relief and that, if the next three injections still did not provide relief, her doctor would recommend surgery.").  Accordingly, remand is

warranted for further consideration of the supportability and consistency of Dr. Gandy's opinion according to the relevant regulations.

## B.  Dr. Spinks' Opinion

### 1.  Medical Opinions and ALJ Decision

Dr. Spinks was one of plaintiff's providers at Upstate University Hospital.  See T. at 641-42.  In January 2018, Dr. Spinks stated that because of plaintiff's concussion symptoms, she "remain[ed] temporarily 100% disabled from return to work."  Id. at 452. In February 2018, Dr. Spinks also stated that plaintiff "remain[ed] 100% impaired from return to her current job[]" because of her concussion symptoms.  Id. at 635.  Plaintiff reported "that primary concussion symptoms include vision dysfunction and frontal headaches. . . .  Vision exercises and stress also exacerbate her headaches. . . .  She also has persisting back pain that affects her daily activities."  Id.  In April 2018, plaintiff "continue[d] to be active in vision therapy (2x/week) and physical therapy for her neck/back (3x/week)."  Id.  "Fatigue is common after short tasks.  Her headaches continue to be in multiple locations . . . .  Visual tasks/exercises are a primary trigger." Id. at 636.  Dr. Spinks stated that plaintiff "remain[ed] temporarily 100% impaired from return to work."  Id.  In May 2018, Dr. Spinks noted that plaintiff reported "some headache improvement since starting" a new medication.  Id.  Plaintiff was "still busy" with physical and vision therapies, her daughter and two grandchildren were living with her, her stress levels were higher, and "[w]hen she ha[d] symptom exacerbation, it [wa]s usually headache, but also nausea."  Id. at 636-37.  Dr. Spinks determined that plaintiff remained "100% impaired from return to work."  Id. at 637.  In July 2018, plaintiff's severe headaches were "far more rare, but she gets some milder headaches most days

of the week." Id.  She received tinted lens to use when she looked at a computer or in bright situations, which Dr. Spinks encouraged her to use.  See id.  Plaintiff "had tried injections and saw [Syracuse Orthopedic Specialists] and New York Spine and Wellness [] for [her back pain].  She [wa]s done with PT and just use[d] their gym to maintain her gains, with benefit."  Id. at 637-38.  Dr. Spinks noted that plaintiff "remain[ed] temporarily 100% impaired from return to work, primarily related to her post-concussion symptoms, which affect other symptoms (e.g., headaches, reduced mental stamina)."  Id. at 638.

In August 2018, Dr. Spinks stated that plaintiff's "orthopedic issues likely compound headaches, sleep, cognition, but I feel her concussion symptoms have improved overall such that she can be cleared for some part time work, related to concussion only."  T. at 639.  Dr. Spinks "cleared [plaintiff] for 3-4 hours/day, with reasonable breaks from the computer screen depending on the type of work. . . .  I feel she remains about 50% temporarily impaired from a concussion standpoint . . . ."  Id.  In October 2018, plaintiff was having low back and neck pain and her sleep was "poor." Id.  "The nature of the headaches still seem[ed] to be multifactorial."  Id.  In November 2018, plaintiff reported more anxiety when being in the car and "other heightened stress anxiety," and "[h]er post-concussion vision issues and headaches, fatigue and sleep dysregulation, reduced mental stamina."  Id. at 640.  Dr. Spinks determined that plaintiff was "about 50% temporarily disabled related to persisting post-concussion symptoms. Her other orthopedic issues may contribute to additional disability."  Id.  In March 2019, plaintiff reported ongoing stress at home, and some headaches seemed to relate to neck strain, while others related to visual tasks.  See id. at 641.  Dr. Spinks explained

20

that "[a]s of [the] last session in November, [she] rated [plaintiff] at about 50% impaired from work related to persisting post-concussion syndrome.  Depending on progress, that may be more at about 25% impaired at this point."  Id.  The ALJ explained that these records, "most of which are summary assessments regarding issues reserved to the Commissioner[,]" "show how the claimant has improved [with] treatment[.]"  Id. at 20 (citations omitted).

In July 2019, Dr. Spinks completed a medical source statement.  See T. at 533-35.  Dr. Spinks explained that she had been seeing plaintiff every one to two months since May 2017, that plaintiff's diagnosis was a concussion, and that her prognosis was "Good/Fair."  Id. at 533.  Dr. Spinks indicated that plaintiff was "[c]apable of low stress jobs" and clarified that this was "from a concussion standpoint but I am aware she has other health issues/limitations."  Id.  Dr. Spinks did not make any determinations concerning sitting, standing, walking, lifting, carrying, pushing, or pulling because those limitations were "N/A to concussion."  Id. at 533-34.  Dr. Spinks noted that plaintiff would need to take unscheduled breaks and wrote, "may need short rest breaks from computer every hour."  Id. at 534.  She also indicated that "pain or other symptoms" would occasionally or frequently interfere with plaintiff's attention and concentration "based on reports of headaches [and] other pain (non-concussion)."  Id.  She checked the boxes to indicate that plaintiff was "seriously limited, but not precluded" from completing a normal workday and workweek without interruption from psychologically based symptoms and performing at a consistent pace without an unreasonable number and length of rest periods.  Id. at 535.  Dr. Spinks indicated that plaintiff was "limited but satisfactory" in her abilities to maintain attention for a two-hour segment, maintain

regular attendance, sustain an ordinary routine, make simple work-related decisions, accept instructions and respond appropriately to supervisors, get along with co-workers or peers, respond appropriately to changes in the work setting, and deal with normal work stress.  Id.  She also noted that plaintiff was "unlimited or very good" with remembering work-like procedures, understanding and remembering short and simple instructions, carrying out short and simple instructions, asking simple questions, and being aware of normal hazards.  Id.  Dr. Spinks explained her check-marked limitations by writing that "post-concussion vision changes limit tolerance on computer screens and subsequently mental stamina.  She would require short rest breaks about every hour." T. at 535.  Dr. Spinks also indicated that plaintiff would likely miss one day of work per month "related to concussion."  Id.

The ALJ stated that "[t]he only real limit Dr. Spinks provides in this statement are estimated [] off task and pace issues[.]  I have considered Dr. Spinks' assessment and have, accordingly, limited the claimant to goal oriented, and not production pace work. This is somewhat persuasive."  T. at 20.  The ALJ noted that Dr. Spinks "did not define precisely how long the breaks would need to be."  Id.  Additionally, "[r]ecords received from the claimant's insurer reflect that Deborah Spinks. Ph.D.[,] was contacted and in her opinion, on or about July 3, 2019, the claimant was able to work full time, in a sedentary position, with accommodation of a break after every two hours of using the computer[.]"  Id. (citing T. at 258).[7]  The ALJ stated that "[w]hen asked about this sort of

---

[7] The ALJ's citation concerning Dr. Spinks July 2019 statement is to a letter from Lincoln Financial Group to plaintiff regarding a claim for Long Term Disability benefits.  See T. at 20, 257-58.  The letter states, "[w]e also had a second physician board certified in Internal Medicine complete a review and they opined as follow[s]: 'The case was discussed with Debra E. S[p]inks, PhD who states the claimant is able to work full time, in a sedentary position with accommodation of a break after every two hours of using the computer.'"  Id. at 258.

limit, the vocational expert testified that breaks could be of varied duration, and that even needing a 5-minute break every hour would be tolerated off task behavior[.]"  Id.; see T. at 85-87.  "Given the condition treated by Dr. Spinks would be variable, it is apparent that a specific time limit for breaks need not be included in the residual functional capacity, as it is tolerated off task behavior."  Id. at 20.

## 2.  Analysis

Plaintiff argues that the ALJ erred in failing to discuss the portion of Dr. Spinks' medical source statement in which she determined that plaintiff was capable of low stress work and that a "specific stress analysis[]" should have been performed and a stress limitation should have been included in plaintiff's RFC.  Dkt. No. 14 at 21-25.  The Commissioner argues that "the ALJ was not required to explain why she declined to adopt Dr. Spinks'[] opinion that [p]laintiff was limited to 'low stress' jobs, due to concussions . . . because 'an ALJ is not required to explicitly address each limitation from each medical opinion in the RFC.'"  Dkt. No. 17 at 9 (citation omitted).  The Commissioner asserts that the ALJ sufficiently discussed plaintiff's stress elsewhere in her decision.  See id. (citations omitted).  In the alternative, the Commissioner contends that should the Court find error in the ALJ's analysis, that any error "be deemed harmless[]" because the jobs identified by the vocational expert ("VE") require reasoning levels that are consistent with low stress work.  Id. at 10.

The Commissioner relies on David N. v. Comm'r of Soc. Sec., No. 19-CV-219 (LJV), 2021 WL 2525096, at *3 (W.D.N.Y. June 21, 2021) to support the contention that "an ALJ is not required to explicitly address each limitation from each medical opinion in the RFC."  Dkt. No. 17 at 9; David N., 2021 WL 2525096, at *3 (citing Matta v. Astrue,

508 F. App'x 53, 56 (2d Cir. 2013) (summary order) ("Although [an] ALJ's conclusion may not perfectly correspond with any of the opinions of medical sources cited in his decision, he [is] entitled to weigh all of the evidence available to make an RFC finding that [is] consistent with the record as a whole."); Landers v. Colvin, 14-CV-1090S, 2016 WL 1211283, at *4 (W.D.N.Y. Mar. 29, 2016) ("[A]n ALJ need not call out every moderate limitation by name, provided that the RFC appropriately reflects such limitations. . . .  The determination that [the p]laintiff is limited to 'simple, repetitive, and routine tasks' accounts for [the p]laintiff's limitations as to maintaining attention and concentration, performing activities within a schedule, and maintaining regular attendance.")).

Although an ALJ's RFC determination is not required to include every limitation from each medical opinion, the ALJ is required to resolve conflicts in the record.  See Evelyn R. v. Comm'r of Soc. Sec., No. 19-CV-01554, 2021 WL 4134722, at *3 (W.D.N.Y. Sept. 10, 2021) ("It is well-established that the ALJ has both the ability and the responsibility to resolve conflicts in the evidence . . . .").  This Court has explained that "[t]here is no requirement that the ALJ accept every limitation in [an] opinion . . . ." Kikta v. Comm'r of Soc. Sec., No. 5:15-CV-60 (DNH/ATB), 2016 WL 825259, at *9 (N.D.N.Y. Feb. 9, 2016), report and recommendation adopted, 2016 WL 865301 (N.D.N.Y. Mar. 2, 2016) (emphasis added) (citing Pellam v. Astrue, 508 F. App'x 87, 89 (2d Cir. 2013) (summary order) ("There is no requirement that the agency accept the opinion of a consultative examiner concerning a claimant's limitations[.]"); Cruz v. Colvin, 3:13-CV-723 (MAD/TWD), 2014 WL 4826684, *14 (N.D.N.Y. Sept. 29, 2014) (determining that the ALJ could credit some portions of a consultative opinion, while

properly declining to credit the conclusions that were not supported by the consultative examiner's examination findings and inconsistent with other evidence of record)). However, this Court has remanded an ALJ's decision where he or she did not explain why portions of a medical opinion were not adopted.  See Allen v. Comm'r of Soc. Sec., No. 7:10-CV-1156 (GTS), 2012 WL 4033711, at *9 (N.D.N.Y. Sept. 12, 2012) ("Because the ALJ failed to explain why portions of [two] medical source statements were not adopted, the Court finds that the ALJ did not apply the correct legal standard in determining [the p]laintiff's RFC assessment."); see also Lawrence W. v. Comm'r of Soc. Sec., No. 5:17-CV-0877 (TWD), 2018 WL 4509490, at *8 (N.D.N.Y. Sept. 18, 2018) ("[T]he ALJ's failure to explain why he chose not to incorporate certain limitations set forth in the medical source statement despite explicitly affording great weight to [the] opinion leaves the ALJ's otherwise thorough decision lacking the clarity necessary to enable this Court to determine whether the ALJ's findings are supported by substantial evidence.").

Here, the ALJ discussed Dr. Spinks' opinion concerning her pace limitation and plaintiff's need to take breaks.  See T. at 20.  The ALJ did not discuss Dr. Spinks' opinion that plaintiff was capable of only low stress jobs.  See id. at 20, 533.[8]  However, "[t]he Court notes that a lack of explanation is not error where the reviewing court can determine the underlying rationale."  Lawrence W., 2018 WL 4509490, at *8 (citing Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 78 (N.D.N.Y. 2005) (citation and

---

[8] The Court also notes that the ALJ seemingly relied on the Lincoln Financial Group letter that reiterated a statement from Dr. Spinks that plaintiff was able to work full time and would need a break after every two hours of using a computer.  See T. at 20, 258. However, the ALJ did not reconcile the rest of Dr. Spinks' statement, that plaintiff could perform only sedentary work, with the RFC or other evidence in the record. See T. at 20, 258.  Dr. Gandy's medical source statement also limited plaintiff to, if anything, sedentary work.  See id. at 849.

internal quotation marks omitted) ("Where the evidence of record permits [the court] to glean the rationale of an ALJ's decision, [the ALJ is not required to explain] why he considered particular evidence unpersuasive or insufficient to lead him to a conclusion of disability.'")).

The Commissioner asserts that the ALJ appropriately considered plaintiff's stress by acknowledging plaintiff's reported problems with stress and determining that "the record evidence did not support any severe mental impairment, nor [p]laintiff's allegations regarding the intensity, persistence and limiting effects of her mental impairments[.]"  Dkt. No. 17 at 9 (citing T. at 14, 17).

The ALJ's discussion concerning plaintiff's stress occurred primarily at step two of the disability evaluation in which the ALJ determined that plaintiff did not have a severe mental impairment.  See T. at 14-15.  The ALJ noted that plaintiff had never been hospitalized for a mental condition; "her mental status examinations by treating providers are consistently within normal limits, with normal or only mildly dysthymic mood and affect and orientation in all spheres"; and although she reported that she had anxiety while being a passenger in a car, she told the consultative examiner and testified that she is able to drive.  Id. at 14 (citing T. at 295, 349, 354, 359, 366, 372, 391, 400-16, 442; 446-54, 638, 748, 754, 774, 875).  The ALJ reiterated Dennis Noia, Ph.D.'s, consultative examination findings that plaintiff had "occasional mild limitations regulating emotions, controlling behavior, and maintaining well-being[.]"  Id. (citing T. at 444).  The ALJ determined that as to adapting or managing oneself, plaintiff had a mild limitation, but that she had no limitations in the three other mental health categories. See id. at 15.  She also stated that plaintiff reported "problems with stress, and reports

that this triggers headaches[.]" Id. (citing T. at 293). "She told the consultative examiner that she that she is able to dress, bathe, and groom herself, cook and prepare food, do general cleaning, laundry, shopping, manage money, drive, and use public transportation[.]" Id. (citing T. at 443). Finally, the ALJ stated that plaintiff "does report anxiety when riding in a car[; h]owever, [she] is able to drive, and drove herself to the hearing[.]" Id. (citing T. at 442, 447); see also T. at 50-51. In making the RFC determination, the ALJ stated that plaintiff "report[ed] problems . . . dealing with stress[.]" T. at 17 (citing T. at 292-94, 317).

In determining that the record did not support plaintiff's allegations of a severe mental impairment, the ALJ did not discuss Dr. Spinks' low-stress limitation. See T. at 13-21. The ALJ also did not discuss Dr. Spinks' treatment records which indicated that plaintiff's headaches are, in part, stress induced. See id. at 635 ("[S]tress is still a headache trigger and may also affects sleep[.]"); 640 ("[S]he reports noticing more anxiety in the car . . . . We discussed whether there is still other heightened stress anxiety, which she confirms there is."); 1094 ("She still has some home stressors but is more hopeful those changes will occur in the next week or two."). In her medical opinion, Dr. Spinks indicated that plaintiff's "pain or other symptoms" would occasionally or frequently interfere with her attention and concentration "based on reports of headaches [and] other pain[.]" Id. at 534. Dr. Spinks also checked the box to indicate that plaintiff was "[s]eriously limited, but not precluded" from completing a normal workday or workweek without interruptions from psychologically based symptoms. Id. at 535. PA-C Christensen also noted that to reduce plaintiff's posttraumatic headaches, she should try various "stress management" techniques. Id. at 450. Dr. Gandy

27

determined that plaintiff was "[i]ncapable of even 'low stress' jobs[.]"  Id. at 849.  The ALJ did not discuss the stress related limitations that were indicated in treatment notes or analyze whether Dr. Spinks' or Dr. Gandy's opined stress limitations were supported by or consistent with the record.  See id. at 20.

Although an ALJ need not recite every piece of evidence supporting his or her decision, the ALJ must explain his or her decision to a sufficient degree that the Court can glean the rationale.  See supra at 17.  As the ALJ did not discuss the stress limitation in Dr. Spinks' opinion, or Dr. Gandy's stress limitation and the treatment records that seem to support the opinion, the Court cannot glean the ALJ's rationale in excluding a stress related limitation from plaintiff's RFC.  See Jesse S. v. Comm'r of Soc. Sec., No. 8:17-CV-0854 (CFH), 2018 WL 4509492, at *2, *7 (N.D.N.Y. Sept. 19, 2018) (remanded the ALJ's decision because the ALJ found that the plaintiff had only physical impairments and could perform the full range of light work, but "the ALJ's analysis of [an] opinion fails to address her indication that [the p]laintiff can do a low stress job within his physical limitations and having no strict production or time requirements.").

The Commissioner argues that any error on this issue is harmless because "[b]ased on testimony from the vocational expert, the ALJ made an alternative finding that [p]laintiff could perform the representative jobs of 'office helper[,]' 'marker,' and 'cashier II[]'" which require "reasoning level[s]" or two and three and are compatible with low stress work.  Dkt. No. 17 at 10 (citations omitted).  "[R]eviewing courts have held that jobs with DOT reasoning levels of three are compatible with limitations to simple and low stress work."  Race v. Comm'r of Soc. Sec., No. 1:14-CV-1357 (GTS/WBC),

2016 WL 3511779, at *7 (N.D.N.Y. May 24, 2016), report and recommendation adopted, 2016 WL 3512217 (N.D.N.Y. June 22, 2016) (citations omitted); see also Cowley v. Berryhill, 312 F. Supp. 3d 381, 384 (W.D.N.Y. 2018) (citations omitted) ("It is well settled that the positions identified by the vocational expert, including mail clerk, photocopy machine operator, and collator operator, are unskilled jobs that are suitable for claimants with limitations to 'low-stress' work."). "[A] reasoning level of three [] is more demanding than a reasoning level of two." Timothy M. v. Kijakazi, No. 1:20-CV-310 (BKS), 2021 WL 4307455, at *16 (N.D.N.Y. Sept. 22, 2021).

Plaintiff argues that the ALJ's failure to explicitly address Dr. Spinks' stress limitation is "harmful" because "[s]tress is "highly individualized,' and an ALJ must make 'specific findings about the nature of a claimant's stress, the circumstances that trigger it, and how those factors affect his ability to work.'" Dkt. No. 14 at 25 (quoting Stadler v. Barnhart, 464 F. Supp. 2d 183, 189 (W.D.N.Y. 2006)) (citing Social Security Ruling ("SSR") 85-15: Titles II, XVI: Capability to Do Other Work—The Medical-Vocational Rules As A Framework For Evaluating Solely Non-exertional Impairments, 1985 WL 56857, at *6). Plaintiff correctly states the standard laid out in SSR 85-15 which has been recently reiterated by the Second Circuit: "the Social Security Administration has itself emphasized the importance of crafting an individualized assessment of non-exertional impairments, such as difficulties interacting with others." Rucker v. Kijakazi, No. 21-621-CV, __ F.4th __, 2022 WL 4074410, at *4 (2d Cir. Sept. 6, 2022) (citing SSR 85-15, 1985 WL 56857, at *6 ("The reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances. . . .  Any impairment-related limitations created by an

individual's response to demands of work . . . must be reflected in the RFC assessment.")).  However, SSR 85-15 "provide[s] a framework for decisions concerning persons who have only a nonexertional limitation(s) of function or an environmental restriction(s)."  SSR 85-15, 1985 WL 56857, at *1.  Exertional capabilities are "those required to perform the primary strength activities" which are sitting, standing, walking, lifting, carrying, pushing, and pulling.  SSR 83-10, Titles II & Xvi: Determining Capability to Do Other Work-the Med.-Vocational Rules of Appendix 2, 1983 WL 31251, at *2 (S.S.A. 1983).  "Any job requirement which is not exertional is considered to be nonexertional."  SSR 85-15, 1985 WL 56857, at *2.

Here, plaintiff does not have only nonexertional impairments as the ALJ limited plaintiff in her ability to sit, stand, walk, lift, and carry.  See T. at 16.  As such, SSR 85-15 is inapplicable to plaintiff's claim.  See Wyman v. Berryhill, No. 5:16-CV-25 (GLS), 2017 WL 1184203, at *2 (N.D.N.Y. Mar. 29, 2017) (citations omitted) ("SSR 85-15 applies if a claimant *only* suffers from nonexertional limitations and not where a claimant suffers from a combination of exertional and nonexertional limitations.").  Rather, SSR 83-14 discusses the evaluation of claims concerning both exertional and nonexertional impairments.  See SSR 83-14, Titles II & Xvi: Capability to Do Other Work-Themedical-Vocational Rules As A Framework for Evaluating A Combination of Exertional & Nonexertional Impairments, 1983 WL 31254, at *2 (S.S.A. 1983).  SSR 83-14 discusses the impact of stress on a claimant, in that "[e]xposure to particular work stresses may not be medically sustainable for some persons with mental impairments, as would be the case with some persons who have physical impairments (e.g., certain cardiovascular or gastrointestinal disorders)."  Id.  SSR 83-14 does not, however, have

30

the same requirement as SSR 83-15 concerning a plaintiff's response to stress being reflected in the RFC assessment.  See id.; see also SSR 85-15, 1985 WL 56857, at *6.

The Court agrees with the Commissioner that courts have held that reasoning levels of two and three are compatible with unskilled, simple, and low stress work.  See Dkt. No. 17 at 10; Race, 2016 WL 3511779, at *7.  Additionally, plaintiff does not explain what causes her stress, or how incorporating a limitation to low-stress work would change the outcome of the ALJ's decision.  See Petrusiello v. Comm'r of Soc. Sec., No. 18-CV-6553 (JMA), 2021 WL 1238713, at *8 (E.D.N.Y. Mar. 31, 2021) ("Ultimately it is [the p]laintiff's burden to prove that he should have a more restrictive RFC than the one assessed by the ALJ."); John S. v. Kijakazi, No. 1:20-CV-1468 (GTS), 2022 WL 866548, at *10 (N.D.N.Y. Mar. 23, 2022) ("The ALJ's failure to include limitations regarding these functions in his RFC determination is harmless error because inclusion of these limitations would not have changed the ALJ's Step Five determination.").

However, remand for further proceedings is appropriate because the cases that the Commissioner relies on are distinguishable and the determination as to whether plaintiff could perform the jobs that the VE identified if plaintiff was further limited by her stress, is a determination best left to the ALJ.  First, the two cases that the Commissioner relies on to assert that the ALJ's error is harmless are distinguishable. See Dkt. No. 17 at 10 (citing Race, 2016 WL 3511779, at *7; Timothy M., 2021 WL 4307455, at *16).  In both cases, the Court addressed a plaintiff's step-five challenge after determining that an RFC, which included a limitation to simple and repetitive tasks, was supported by substantial evidence.  See Race, 2016 WL 3511779, at *1, *7; Timothy M., 2021 WL 4307455, at *17.  In Race, the plaintiff argued that the ALJ erred

31

in failing "to include specific limitations pertaining to [the p]laintiff's ability to interact appropriately with others." Race, 2016 WL 3511779, at *3. The Court held that the ALJ's RFC determination, limiting the plaintiff "to simple repetitive tasks in low stress occupations defined as those having no more than occasional decision making required and nor more than occasional changes in the work setting[]" was supported by substantial evidence and any error in failing to include a specific social functioning limitation was harmless because "the medical evidence here established that [the p]laintiff was capable of performing simple, routine tasks and unskilled work despite limitations in social functioning." Id. at *1, *5.

Similarly, in Timothy M., the ALJ limited the plaintiff to "to simple, repetitive jobs involving no more than one or two tasks" and "'low stress' work defined as having no more than occasional decision-making required or occasional changes in the work setting; he could tolerate occasional interaction with the public or coworkers, but could not work in tandem with coworkers." Timothy M., 2021 WL 4307455, at *6 (citation omitted). The "[p]laintiff argue[d] that the ALJ failed to resolve apparent conflicts between the RFC determination limiting him to 'simple, repetitive jobs involving no more than one or two tasks' and the [VE's] testimony [] that a hypothetical person with [the p]laintiff's RFC could perform jobs requiring a reasoning level of two[.]" Id. at *15. The Court determined that there was no conflict between the ALJ's RFC determination and jobs requiring a reasoning level of two because "a growing number of courts have held that jobs with DOT reasoning levels of two or three are compatible with limitations to simple, routine work." Id. at *16 (collecting cases) (citations omitted).

Here, the ALJ's RFC determination is not based on substantial evidence because the ALJ failed to discuss and resolve any conflicts in the record concerning plaintiff's stress.  See supra at 23-28.  The ALJ did not limit plaintiff to simple, unskilled, or low stress work.  See T. at 16.  Stress is also different for every individual and may impact various mental or physical functions.  See SSR 83-14, 1983 WL 31254, at *2 ("Exposure to particular work stresses may not be medically sustainable for some persons with mental impairments, as would be the case with some persons who have physical impairments . . . .").[9]  As such, if Dr. Spinks' stress-limitation was adopted and plaintiff required a "low-stress" job, there is no guarantee that she could perform the jobs that the VE identified despite them having reasoning levels of two and three because the ALJ did not determine how plaintiff's stress impacts her ability to function in a work setting.  See T. at 15-22; cf. Rucker, 2022 WL 4074410, at *4 (explaining that in the context of SSR 85-15, "the Commissioner argues that any omission as to social interactions was harmless error, since the jobs identified by the vocational expert were consistent with additional restrictions. . . .  We do not agree that the omission was harmless.  [T]he Commissioner's logic is circular.  The premise of [the plaintiff's] argument is that her social limitations prevent her from being employed in any

---

[9] The Second Circuit has held that "[a]n ALJ's failure to incorporate mental limitations into an RFC otherwise supported by substantial evidence is harmless error where '(1) medical evidence demonstrates that a claimant can engage in simple, routine tasks or unskilled work despite' those limitations, and 'the challenged hypothetical is limited to include only unskilled work;' or (2) the hypothetical 'otherwise implicitly account[ed] for a claimant's' mental limitations."  Brogdon v. Berryhill, No. 17-CV-7078 (BCM), 2019 WL 1510459, at *14 (S.D.N.Y. Mar. 22, 2019) (quoting McIntyre v. Colvin, 758 F.3d 146, 152 (2d Cir. 2014)).  Dr. Spinks opined that plaintiff was "unlimited" in her ability to understand, remember, and carry out very short and simple instructions and the three jobs that the VE identified at step five are unskilled positions.  T. at 535.  However, the ALJ did not present a hypothetical to the VE which addressed unskilled work or otherwise accounted for limitations concerning plaintiff's stress.  See id. at 101-107; see also McIntyre, 758 F.3d at 152; Race, 2016 WL 3511779, at *1, *6 ("[T]he ALJ provided a hypothetical to the VE that include [the p]laintiff's abilities and restrictions set forth in the RFC" including a limitation to "simple repetitive tasks in low stress occupations . . . .").

workplace.  To assume that the level '8' jobs would not burden her, because they involve a very low level of human interaction, begs the question of whether that low level is itself sufficient.").

For instance, it is unclear if plaintiff's stress impacts her ability to reason, adapt to changes, make plans independent of others, control her behavior, regulate her emotions, maintain a consistent pace, concentrate, or any other limitation.  Dr. Noia determined that plaintiff had mild limitations in her ability to regulate her emotions, maintain her well-being, and control her behavior; Dr. Spinks determined that plaintiff was capable of low stress work but was seriously limited in her ability to complete a normal workday or workweek without interruption from her psychologically based symptoms, and her headaches and pain would occasionally or frequently interfere with her ability to concentrate; and Dr. Gandy determined that plaintiff was not capable of "even 'low stress' jobs."  T. at 849; 444, 534-35.  The ALJ did not reconcile these opinions with her RFC determination, and it is not evident whether plaintiff's stress is accommodated by a pace limitation or whether greater restrictions are required.  See id. at 16.  Although it is possible that on remand the ALJ could determine that plaintiff can perform the same jobs as previously identified, even considering the impact of her stress, such a conclusion is best left to the ALJ.  See McGill v. Berryhill, No. 16-CV-4970 (RRM/PK), 2018 WL 1368047, at *11 (E.D.N.Y. Mar. 16, 2018) ("[I]n his decision, the ALJ does not address whether such a low-stress limitation is warranted. . . .  To determine whether the RFC should include a low-stress limitation, the Court would need to weigh the evidence in the record, a task that is fundamentally the ALJ's

responsibility.").  Accordingly, remand for further proceedings is warranted on this ground.

### V. Conclusion

**WHEREFORE**, for the reasons stated herein, it is hereby:

**ORDERED**, that the Commissioner's decision is **REVERSED and REMANDED for further proceedings**; and it is further

**ORDERED**, that the Commissioner's cross-motion for judgment on the pleadings (Dkt. No. 17) is **DENIED**, and plaintiff's motion for judgment on the pleadings (Dkt. No. 14) is **GRANTED**; and it is further

**ORDERED**, that the Clerk of the Court serve copies of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

Dated: September 13, 2022
    Albany, New York

Christian F. Hummel
U.S. Magistrate Judge